UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
CATHERINE MARCHETTI,

                Plaintiff,         **NOT FOR PUBLICATION**

      -against-           **MEMORANDUM AND ORDER**
                                      13-CV-02581(KAM)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

                Defendant.
----------------------------X

**MATSUMOTO, United States District Judge:**

    Pursuant to 42 U.S.C. § 405(g), plaintiff Catherine Marchetti ("plaintiff"), appeals the final decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "defendant"), which denied plaintiff's application for Social Security Disability ("SSD") benefits under Title II of the Social Security Act ("the Act"). Plaintiff contends that she is disabled within the meaning of the Act as a result of injuries to her spine sustained during an accident on October 28, 2009. Plaintiff's medical history also indicates left-side cubital tunnel syndrome and bilateral carpal tunnel syndrome. Plaintiff claims that her disability entitles her to receive SSD benefits.  Presently before the court are the parties' cross-motions for judgment on the pleadings.  For the reasons stated below, both parties' motions are denied and this

case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

**BACKGROUND**

## I. Personal & Treatment History

Catherine Marchetti was 52 years old on May 5, 2010, the disability onset date. (Administrative Record ("Tr."), 141.) At that time, she lived with her husband in a house in Brentwood, N.Y. (Tr. 176-77.). She has a high school diploma (Tr. 169), and she had worked as a school bus driver for around 25 years. (Tr. 60, 160, 169, 192-193, 201).[1] Prior to becoming a bus driver, plaintiff had worked for eight years as a hairdresser and manicurist. (Tr. 201.) Plaintiff was 5'6" tall and weighed approximately 220 pounds around the time her alleged disability began. (Tr. 168.)

On October 28, 2009, plaintiff slipped on a step while disembarking from her bus. She avoided falling by catching herself on a handrail, but, in doing so, injured her shoulder, neck, hand, and thumb. (Tr. 62.) Following the accident, plaintiff continued in her job as a bus driver until May 5, 2010, the disability onset date. (Tr. 69-70.) She testified that she quit her job because her restricted neck motion and numbness in her fingers made it difficult for her to drive. (*Id.*)

---

[1] The record indicates both 1984 and 1989 as start dates for plaintiff's employment as a bus driver.

**II.  Medical Facts in the Administrative Record**

1.  <u>Plaintiff's Testimony Regarding Her Symptoms</u>

Plaintiff testified that after her accident she developed shooting pain (Tr. 65), stiffness (Tr. 61), and reduced range of motion in her neck (Tr. 61, 65, 67), which she complained "cracks and snaps" with movement. (Tr. 65, 67). She also experienced numbness in the small and ring finger of her left hand and in four fingers of the right hand. (Tr. 61, 65, 69.) She attributed the numbness to carpal tunnel syndrome. (Tr. 61, 65.) Plaintiff also reported shoulder pain "when I use my arm a lot." (Tr. 67.) She believed the shoulder pain was radiating from her neck. (Tr. 67.)

At the time of her administrative hearing, plaintiff did her own shopping, light cleaning, laundry, and some cooking, although she could not lift heavy objects or manage more physically demanding housework like vacuuming. (Tr. 69.) She reported difficulty sleeping as a result of the symptoms in her neck. (Tr. 66.) Plaintiff had undergone physical therapy for her neck, and reported taking Flexeril and ibuprofen, together with Nexium for stomach side-effects from the ibuprofen. (Tr. 62-63.) Plaintiff also reported using braces when sleeping and a neck traction device when awake. (Tr. 182.)

Plaintiff's hobbies included crocheting, knitting, and baking, but she said that she was unable to do these because of

her disability. (Tr. 69.)

2. Medical Records Submitted to the ALJ Relating to Period
   Prior to Disability Onset Date (May 5, 2010)

*Treatment Record with Dr. Lippe, Treating Orthopedic
Surgeon*

On November 17, 2009, plaintiff presented for a

consultation with Dr. Robert J. Lippe of Island Orthopaedics and

Sports Medicine (Tr. 217-19, 224-26, 392-94, 420-21.) Plaintiff

complained of pain in her right hand, right shoulder, and the

right side of her neck following an accident on October 28,

2009. (*Id.*) Although she had experienced neck symptoms for about

a week or two prior to the accident, plaintiff explained that

after the accident the neck symptoms had changed. (*Id.*)

Plaintiff reported no symptoms on her left side. (*Id.*) On

examination, Dr. Lippe found that plaintiff's range of neck

motion was at 80%, and that the neck was tender on the right

side and exhibited slight spasm. The right shoulder had a "good"

range of motion, though there was some trapezial[2] pain with

movement. (Tr. 218) Impingement sign[3] was negative, and rotator

cuff strength was "good" against resistance. (Tr. 217.) The

right hand had "some sensitivity" at the base of the thumb, more

_____

[2] Relating to the trapezius, a muscle extending longitudinally along the
spine from the occipital lobe at the back of the head to the upper thoracic
vertebrae and used in rotating the head and neck. *Stedman's Medical
Dictionary*, 1256 (28th Ed. 2006) ("*Stedman's*").
[3] "Pain in patients with rotator cuff tendinitis or tears within the
subacromial space elicited by provocative physical examination maneuvers."
*Id.* at 1769.

4

so than the thenar side[4], with good range of motion. Tinel's

sign[5] was negative over the median nerve. (Tr. 218.) X-rays of

the cervical spine confirmed degenerative disc changes at C5-6.

X-rays of the right shoulder and acromioclavicular (AC) joint[6]

were negative. X-rays of the right hand were negative. (*Id.*) Dr.

Lippe diagnosed a cervical sprain; right cervical radiculitis[7];

shoulder pain, which was radicular in nature; and right hand

sprain. (*Id.*) Dr. Lippe noted that plaintiff was working at the

time, and recommended that she seek physical therapy. (*Id.*)

Dr. Lippe saw plaintiff for a follow-up visit on December

28, 2009. (Tr. 216, 227, 388, 423.) Plaintiff reported some

relief from physical therapy, and indicated that she was still

working, but complained of ongoing pain in the back of her head

and in the right shoulder. (*Id.*) Dr. Lippe found that

plaintiff's neck motion was at 75%, with residual tenderness and

some spasm. Neurologic exam of the upper extremities remained

negative, right shoulder motion was "good," and impingement sign

was negative. (*Id.*) Dr. Lippe prescribed Motrin and recommended

plaintiff continue physical therapy. (*Id.*)

On January 25, 2010, plaintiff complained to Dr. Lippe of

---

[4] Nearer the base of the thumb. *See Stedman's* at 1970.

[5] "A sensation of tingling, or of 'pins and needles,' felt at the lesion site or more distally along the course of a nerve" when the nerve is gently tapped with a finger during examination. Indicates partial damage to a nerve or regeneration in a damaged nerve. *Stedman's* at 1772.

[6] The point where the clavicle and the lateral part of the scapula meet. *Stedman's* at 19.

[7] Disorder of the spinal nerve roots. *Id.* at 1622.

ongoing discomfort on the right side, noting that physical therapy had been of little benefit. (Tr. 215, 228, 385, 424.) Dr. Lippe recorded plaintiff's neck motion at 70%, with paracervical and trapezial tenderness. Neurologic exam of the upper extremities remained negative. (*Id.*) Dr. Lippe ordered a magnetic resonance imaging scan ("MRI") of the cervical spine, prescribed a Medrol Dosepak for inflammation, and told plaintiff to continue physical therapy. (*Id.*)

A subsequent MRI of the cervical spine, performed on February 25, 2010, showed:

- Small disc herniation at the C3-C4 level, with mild narrowing of the neural foramen. (Tr. 241-2, 402-03, 450-451.)

- Mild disc bulging and posterior vertebral osteophyte formation at the C4-C5 level, with mild mass effect upon the anterior aspect of the dural sac and moderate narrowing of the neural foramina. (*Id.*)

- Mild central stenosis at the C5-C6 level due to posterior vertebral osteophyte formation, with prominent narrowing of the neural foramina due to degenerative changes within the uncovertebral joints. (*Id.*)

- Mild mass effect upon the anterior aspect of the dural sac at the C6-C7 level secondary to mild disc bulging and posterior vertebral osteophyte formation. (*Id.*) There was a

prominent narrowing of the right neural foramen and
moderate narrowing of the left neural foramen due to
degenerative changes within the uncovertebral joints. (*Id.*)

- Moderate narrowing of the left neural foramen at the C7-T1
level. (*Id.*)

Plaintiff followed up with Dr. Lippe again on March 8, 2010
(Tr. 230, 376, 425.) Dr. Lippe noted the results of the MRI and
conducted an exam, finding neck motion at 75% with slight right-
sided tenderness. Dr. Lippe diagnosed cervical sprain and right
radiculitis with multilevel degenerative disc disease (*Id.*)
Noting that plaintiff was still working, he referred her to
physical therapy and renewed a prescription for ibuprofen. (*Id.*)

On April 6, 2010, plaintiff complained to Dr. Lippe of
"clicking and snapping in her neck with movement," and reported
that she had not experienced significant relief from therapy.
(Tr. 213, 231, 372, 426.) Dr. Lippe found plaintiff's neck
motion restricted to 50%, with right-sided tenderness and
paravertebral spasm. Neurologic exam of the upper extremities
remained negative. (*Id.*) Dr. Lippe recommended plaintiff stop
physical therapy and seek chiropractic treatment. (*Id.*)

2.  <u>Medical Records Submitted to the ALJ Relating to Period
    from Plaintiff's Claimed Disability Onset Date (May 5,
    2010)</u>

    *Treatment Record with Dr. Lippe, Treating Orthopedic
    Surgeon*

On May 5, 2010, plaintiff saw Dr. Lippe again, reporting continuing neck pain, crepitation with neck movements, and some numbness in her little and ring fingers. (Tr. 212, 232, 369, 427.) She reported that she had started chiropractic treatment, but had not yet had any significant relief and was "having a hard time driving the bus." (*Id.*) Dr. Lippe found neck motion restricted to 50-60%, with paracervical and trapezial tenderness and spasm. (*Id.*) Neurologic exam of the upper extremities was negative, except for "some numbness" in the little and ring fingers. (*Id.*) Dr. Lippe prescribed Arthrotec for inflammation and recommended that plaintiff stop working and rest while continuing with chiropractic treatment. (*Id.*)

On May 27, 2010, Dr. Lippe reported that plaintiff had had an electromyography test ("EMG"), which showed moderate carpal tunnel syndrome bilaterally, moderate cubital tunnel syndrome of the left arm, and mild C6-C7 cervical radiculopathies bilaterally. (Tr. 211, 233, 365, 428.) Examination showed neck range of motion at 60%. Plaintiff showed a slight positive Tinel sign over the ulnar nerve in the cubital tunnel. (*Id.*) Strength of the first dorsal interosseous was intact against resistance. (*Id.*) Dr. Lippe diagnosed left arm cubital tunnel syndrome and bilateral carpal tunnel syndrome, in addition to his existing diagnosis of cervical sprain with radiculopathy and multilevel degenerative disc disease. (*Id.*) Dr. Lippe recommended future

cubital and carpal tunnel release surgery and continued treatment with a chiropractor. (*Id.*)

On June 29, 2010, plaintiff complained to Dr. Lippe of sharp pain in the right side of her neck and of numbness in the left little and ring fingers. (Tr. 210, 234, 361, 429.) Dr. Lippe found neck range of motion at 60%, and slight paracervical and trapezial tenderness. Plaintiff showed a minimal Tinel sign over the ulnar nerve of the cubital tunnel. Strength of the first dorsal interosseous was intact against resistance. Phalen's sign was negative at the wrist and pinch strength was intact. (*Id.*) Dr. Lippe noted that plaintiff was still "unable to work of yet, disabled from her job," and recommended continued treatment with chiropractics and Motrin. (*Id.*)

A follow-up examination on July 27, 2010 found neck range of motion at 70%, with slight tenderness and spasm. (Tr. 209, 235, 356, 430.) There was a mildly positive Tinel sign over the ulnar nerve of the cubital tunnel. Strength of first dorsal interosseous was intact against resistance. (*Id.*)

Examination on August 30, 2010 showed neck range of motion at 70%. (Tr. 208, 236, 353, 431.) Plaintiff showed a positive Tinel sign over the ulnar nerve of the cubital tunnel, but negative Tinel over the median nerves of the wrist. (*Id.*) There was "very slight atrophy" of the first dorsal interosseous, but strength was intact. Dr. Lippe noted that plaintiff remained

"unable to work her job." (*Id.*) Dr. Lippe discussed possible left ulnar nerve decompression and anterior transposition. (*Id.*)

Examination on September 28, 2010 showed neck range of motion of 75%, positive Tinel over the ulnar nerve of the cubital tunnel, and "slight atrophy" of the first dorsal interosseous, with a negative Phalen's sign. (Tr. 207, 237, 350, 432.) Dr. Lippe noted that plaintiff was still "unable to work her job" and recommended continued therapy. (Tr. 207.) Examinations on October 26, 2010 (Tr. 206), November 23, 2010 (Tr. 239), and December 23, 2010 (Tr. 240) found substantially similar results.

Examination on May 13, 2011 showed neck motion at 50%, with restricted rotation and lateral bend. There was paracervical and trapezial spasm. (Tr. 269, 325, 440.) Neurologic exam showed a positive Tinel sign over the ulnar nerve in the cubital tunnel with "subjective numbness to the little and ring fingers." (*Id.*) There was "slight atrophy" to the first dorsal interosseous, but plaintiff was able to abduct against resistance. (*Id.*) Dr. Lippe renewed a prescription for Motrin and prescribed Flexeril. He noted that plaintiff remained unable to work. (*Id.*)

On June 10, 2011, Dr. Lippe noted that patient was still having a lot of neck pain, but that numbness in the ring and little finger "seemed to have a gotten a little less acute."

(Tr. 270, 296.) Dr. Lippe recorded neck range of motion at 60%, noting paracervical and trapezial tenderness and spasm. (*Id.*) There was "slightly positive" Tinel sign over the ulnar nerve in the cubital tunnel. First dorsal interosseous strength was good against resistance. (*Id.*) Dr. Lippe renewed prescriptions for Motrin and Flexeril. (*Id.*) Results of an examination on July 15, 2011 were substantially similar. (Tr. 271, 295, 322, 441.)

On August 16, 2011, plaintiff complained of stiffness and cracking in the neck, numbness in fingers, and "shooting" neck and shoulder pain rating the pain's severity at nine out of ten when active and five out of ten at rest. (Tr. 274-75, 282-83, 318-19 399-400.) Dr. Lippe recorded forward neck flexion at 30, extension at 10. Left and right lateral flexion was 20. Left and right lateral rotation was 60. Hoffman exam was negative. Motor strength of the upper extremities was 5/5 in all distributions. Sensation of the left upper extremity was "altered." (Tr. 275.) There was a positive Tinel over the ulnar nerve in the cubital tunnel and atrophy in the first dorsal interosseous. (*Id.*) Dr. Lippe noted that plaintiff's "percentage of temporary impairment is total" and that her prognosis for recovery was poor. (*Id.*) Dr. Lippe noted that plaintiff's limitations included environmental conditions, lifting, operating motor vehicles, sitting, and use of upper extremities. (*Id.*) Dr. Lippe prescribed Flexeril, requested authorization for chiropractic

care, elbow surgery, and left ulnar nerve decompression. (*Id.*)
Results of an examination on September 19, 2011 were
substantially similar. (Tr. 273.)

On October 24, 2011 (Tr. 276-77, 278-79, 314-15, 442-43),
plaintiff complained of anxiety, depression, and sleep disorder
in addition to past symptoms. (Tr. 277.) Dr. Lippe recorded
plaintiff's forward flexion at 30, extension at 10. Left and
right lateral flexion was 20. Left and right lateral rotation
was 60. (*Id.*) Hoffman exam was negative, and motor strength in
the upper extremities was 5/5 in all distributions. There was
positive Tinel sign over the ulnar nerve in the cubital tunnel,
and some atrophy of the first dorsal interosseous. (*Id.*) Dr.
Lippe prescribed Flexeril and Motrin. (*Id.*)

Results of examination on November 28, 2011 were
substantially similar. (Tr. 284-85, 397-98.)

*Treatment Record with Dr. Yadegar, Physiatrist*

On August 25, 2010, plaintiff saw Arash Yadegar, M.D., a
physiatrist with Orlin & Cohen Orthopedic Associates, LLP,
complaining of "cracking" in her neck, and pain and numbness
radiating into the left hand. (Tr. 263-265.) Dr. Yadegar noted
that plaintiff's pain was exacerbated by stretching, sitting,
walking, cold, lifting, lying in bed, and physical therapy, and
that plaintiff was unable to continue in her job as a bus driver
because this required her to move her neck frequently over the

course of the day. (Tr. 263.) On examination, Dr. Yadegar found tenderness of the midline cervical spine and bilateral tenderness of the paraspinal musculature of the cervical spine and trapezius. (Tr. 264.) Dr. Yadegar found diminished flexion, extension, and lateral bending to the left and right in plaintiff's neck. (*Id.*) Dr. Yadegar diagnosed cervicalgia, herniated cervical nucleus pulposus, cervical radiculopathy, and facet syndrome. (Tr. 264.) Dr. Yadegar noted that plaintiff's limitations included operation of motor vehicles and use of the upper extremities (Tr. 264), and prescribed Ultracet and recommended epidural steroid injections. (Tr. 264.) Dr. Yadegar saw plaintiff again on September 22, 2010, finding no significant changes in her condition. (Tr. 260-262.)

*Treatment Record with Dr. Schur, Chiropractor*

The Administrative Record indicates that plaintiff also received chiropractic therapy from Mark Schur, D.C. from September 2010 to March 2011. (Tr. 287-88, 290.)

*Examination by Dr. Ritholtz, Consultative Examiner*

The Administrative Record includes an assessment of plaintiff's condition, dated February 4, 2011, by Jeffrey C. Ritholtz, D.C., a chiropractic consulting examiner for the New York State Workers' Compensation Board.(Tr. 289-293.) Dr. Ritholtz indicated that he had reviewed plaintiff's medical records, including MRI and EMG results and treatment notes from

13

Drs. Lippe, Yadegar, Finkelstein, and Schur. (Tr. 290.) Dr. Ritholtz had previously examined plaintiff on November 3, 2010 and concluded that claimant had a "temporary partial mild disability at this time" and that she may return to work as a school bus driver "with restrictions of no lifting, pushing, pulling, or carrying over 30 pounds." (*Id.*) He believed that plaintiff's complaints of neck pain and restricted range of motion were not supported by objective medical findings, and that her condition was a chronic, not an acute one. (Tr. 289.)

*Examination by Dr. Skeene, Consultative Examiner*

Dr. Linell Skeene saw plaintiff on February 16, 2011. (Tr. 243-46.) Dr. Skeene noted plaintiff's complaints, reviewed her medical history, and conducted an examination. (*Id.*) Dr. Skeene recorded that plaintiff appeared to be in no acute distress, had a normal gait, and could walk on heels and toes without difficulty. (Tr. 244.) She was capable of a full squat, and had no trouble getting on or off the examination table or rising from a chair. (*Id.*) Hand and finger dexterity were intact, with grip strength 5/5 bilaterally. (*Id.*) Range of motion of the cervical spine was limited to 30 degrees, with lateral flexion at 30 degrees and lateral rotation at 50 degrees. (*Id.*) Plaintiff had full range of motion in shoulders, elbows, forearms, wrists, and fingers bilaterally, with no muscle atrophy and no sensory abnormality. (*Id.*) Dr. Skeene diagnosed

disc disease of the cervical spine, bilateral carpal tunnel syndrome, and left cubital tunnel syndrome. (Tr. 245.) He concluded that plaintiff had a "moderate limitation for reaching and heavy lifting." (*Id.*)

3. <u>Medical Records Submitted to the Appeals Council</u>[8]

*Treatment Record with Dr. Finkelstein, Chiropractor*[9]

Dianne Finkelstein, D.C. provided plaintiff with chiropractic treatment from April 14, 2010 to September 13, 2010, and submitted to the Appeals Council a narrative of plaintiff's treatment dated March 11, 2012. (Tr. 444-446.) Dr. Finkelstein diagnosed displacement of cervical intervertebral disc, without myelopathy, thoracic sprain/strain, and myalgia/myositis. (Tr. 446.) Dr. Finkelstein noted that plaintiff's injuries and the associated inflammation would result in scar tissue formation and cause permanent "restriction, immobility, pain, and future degenerative and arthritic changes in the spinal discs and joints" and that patient "will be predisposed to future exacerbations of cervical

---

[8] Many of the documents that plaintiff submitted to the Appeals Council, and which were added to the Administrative Record, were duplicates of documents already in the record at the time of the ALJ's decision. The court discusses in this section only those documents which were not duplicates. Page numbers of duplicate documents are indicated in citations in Section II, above.

[9] Plaintiff submitted Dr. Finkelstein's report, dated March 11, 2012, to the Appeals Council, but the Council declined to consider the report because the Council found the report did not relate to a period prior to the ALJ's decision of December 13, 2010. (Tr. at 2.) The document does, however, relate to a period prior to the ALJ's decision, specifically, April to September 2010.

spine discomfort." (Tr. 446.)

*Nerve Conduction Study by Dr. Singh, Neurologist*

A nerve conduction study by Tej-Preet Singh, M.D., of Massapequa Neurologic , P.C., dated May 17, 2010 (Tr. 308-13, 455-60) found left sensorimotor ulnar nerve neuropathy at the elbow, with no axonal loss. (Tr. 309.) This finding was consistent with a diagnosis of moderate cubital tunnel syndrome. (*Id.*) The study also found moderate bilateral sensory median nerve neuropathy at the wrist, with no axonal loss, consistent with a diagnosis of carpal tunnel syndrome. (*Id.*) The report noted "mild E.M.G. evidence for bilateral C6 C7 radiculopathies." (*Id.*)

*Additional Records from Dr. Lippe, Treating Orthopedic Surgeon, dated up to December 13, 2011*

Examination on January 20, 2011 showed range of neck motion at 70%, with tenderness and slight spasm. (Tr. 338, 436.) There was a Tinel sign over the ulnar nerve in the cubital tunnel and slight atrophy of the first dorsal interosseous distally. (*Id.*) There was negative Tinel over the median nerve at the wrist. (*Id.*) Dr. Lippe noted that plaintiff "remains unable to work. She is disabled." (*Id.*) He renewed prescriptions for Motrin and Soma. (*Id.*)

Examination on February 18, 2011 showed little change. (Tr. 335, 437.) Dr. Lippe noted that plaintiff "remains unable to

work and is disabled from her job." (*Id.*) He renewed prescriptions for Motrin and Soma. (*Id.*)

Examination on April 15, 2011 showed neck range of motion at 60-70%, with paracervical and trapezial tenderness and spasm. (Tr. 328, 439.) Neurologic exam showed subjective numbness in little and rings fingers with very slight atrophy in the first web, but good abduction strength against resistance on the index finger. (*Id.*) Dr. Lippe noted that patient remained "unable to work her job," renewed prescriptions for Motrin and Soma. (*Id.*)

In letters dated February 18, 2011 (Tr.300), March 18, 2011 (Tr. 299), April 15, 2011 (Tr. 298), May 13, 2011 (Tr. 297), June 10, 2011 (Tr. 296), and July 15, 2011 (Tr. 295), Dr. Lippe opined that plaintiff was "totally disabled" and could not return to work until after further evaluation. Plaintiff also submitted to the Appeals Council forms that Dr. Lippe had submitted to the New York Workers' Compensation Board (Tr. 320-91). In the forms dated December 17, 2009 (Tr. 390-91), January 15, 2010 (Tr. 386-87), February 12, 2010 (Tr. 382-83), February 22, 2010 (Tr. 378-79), March 26, 2010 (Tr. 374-75), April 21, 2010 (Tr. 370-71), and May 25, 2010 (Tr. 366-67), Dr. Lippe opined that the extent of plaintiff's temporary impairment was 75%. In the forms dated June 15, 2010 (Tr. 362-63), July 20, 2010 (Tr. 358-59), August 6, 2010 (Tr. 354-55), September 15, 2010 (Tr. 351-52), October 12, 2010 (Tr. 348-49), November 2,

2010 (Tr. 345-46), December 16, 2010 (Tr. 342-43), January 17, 2011 (Tr. 339-40), February 9, 2011 (Tr. 336-37), March 14, 2011 (Tr. 332-33), April 11, 2011 (Tr. 329-30), May 6, 2011 (Tr. 326-27), May 26, 2011 (Tr. 323-24), and August 4, 2011 (Tr. 320-21), he opined that the extent of plaintiff's temporary impairment was 100%.

*Additional Records from Dr. Lippe, Treating Orthopedic Surgeon, dated after December 13, 2011*

The Administrative Record includes documents submitted to the Appeals Council which relate to a period after December 13, 2011, the date of the ALJ's decision. (*See* Tr. 2.) These include records of examinations by Dr. Lippe on January 2, 2012 (Tr. 411-12) and February 7, 2012 (Tr. 404-05) and an initial evaluation by a physical therapist at Orlin & Cohen Orthopedic Associates, L.L.P. dated January, 9, 2012 (Tr. 414).

### III. Medical Evidence Not Included in the Administrative Record

Plaintiff also submitted to the Appeals Council numerous documents dated after December 13, 2011, which the Council both declined to consider and did not include in the Administrative Record. (*See* Tr. 2.) Among these documents are clinical notes from an assessment by David Benatar, M.D. conducted on March 2, 2012 (Pl.'s Mem. of Law in Support of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") Exh. A; *see also* Tr. 2); a Cervical Spine Impairment Questionnaire, completed by Dr. Lippe on January 12,

2012 (Pl. Mem., Exh. B; *see also* Tr. 2); and a Cervical Spine

Impairment Questionnaire completed by Dr. Benatar on March 2,

2012 (Pl. Mem., Exh. A; *see also* Tr. 2).

I.  Procedural History

Plaintiff filed an application for SSD benefits on

November 18, 2010.  (Tr. 141-42, 145-48.)  She alleged an

inability to work as of May 5, 2009.  (Tr. 141.) The disability

onset date was subsequently amended to May 5, 2010.[10]  On

February 28, 2011 plaintiff's application was denied.  (Tr. 74,

77-84.)   On April 2, 2011, plaintiff requested a hearing before

an administrative law judge ("ALJ").  (Tr. 54-55.)

On December 5, 2011, plaintiff appeared with her attorney,

Sharmine Persaud, Esq., before ALJ Bruce MacDougall.  (Tr 56-

72.)  Plaintiff testified at the hearing about her employment

history, her accident, the type and severity of her symptoms,

and the extent of her alleged disability. (Tr. 58-72.)

On December 13, 2011, ALJ MacDougall found that plaintiff

was not disabled pursuant to the five-step sequential evaluation

process for determining whether an individual is disabled.  (Tr.

34-42; *see* 20 C.F.R. 404.1520(a).)  Specifically, the ALJ found

on step one that plaintiff had "not engaged in substantial

---

[10] Though plaintiff indicated on her initial application a disability
onset date of May 5, 2009 (Tr. at 141), she indicated an onset date of May 5,
2010 in the disability reports related to her application. (Tr. at 168, 192,
201.) Plaintiff explained in a letter from her attorney to ALJ MacDougall,
dated October 31, 2011 (Tr. at 196-97), and in testimony at her oral hearing
(Tr. at 59-60) that the May 5, 2009 date was a typographical error.

gainful activity since May 5, 2010, the alleged onset date."
(Tr. 39.) Regarding step two, the ALJ found that plaintiff had
the severe impairment of cervical degenerative disc disease.
(*Id.*)

With respect to step three, however, the ALJ concluded that
plaintiff did not have an impairment or combination of
impairments that met or were medically equivalent to the
severity of one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1 ("Medical Listings"). (*Id.*) The ALJ found
in particular that the plaintiff did not meet the criteria set
forth under Medical Listing 1.00, relating to musculoskeletal
impairments, though the ALJ did not specify which criteria were
unmet. (*Id.*)

The ALJ also found at step three that plaintiff had the
residual functional capacity ("RFC") to perform "the full range
of simple, unskilled light work" as defined in 20 C.F.R.
404.1567(b). (*Id.*) The ALJ explained that he arrived at this
finding by a two-step process. (Tr. 40.) First, he determined
that plaintiff had a medically determinable impairment that
could reasonably be expected to cause the symptoms alleged. (Tr.
40-41.) But, second, he determined that plaintiff's statements
concerning the intensity, persistence, and limiting effects of
her impairment were inconsistent with the RFC, diagnostic test
results, documented clinical signs, treatment history, work

history, and range of daily activities. (*Id.*) The ALJ noted that he accorded more weight to Dr. Skeene's opinion regarding the extent of plaintiff's disability than to Dr. Lippe's opinion on the matter. The ALJ also observed that none of plaintiff's treating or examining physicians had expressly opined that the plaintiff was incapable of performing any vocational activity. (*Id.*)

At step four of the analysis, the ALJ found that plaintiff was unable to perform past relevant work because her most recent former employment required greater exertional capacity than plaintiff possessed. (Tr. 41.) Finally, at step five, after considering plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (Tr. 41-42.)

On March 8, 2013, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (Tr. 1-8.) Plaintiff filed the instant complaint on April 29, 2013. The parties' cross-motions for judgment on the pleadings were fully briefed on January 31, 2014.

<u>DISCUSSION</u>

**I. Applicable Legal Standards**

A.  Standard of Review

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)(internal quotation marks omitted).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. *See* 42 U.S.C. § 405(g). Moreover, the reviewing court "may not substitute [its] own judgment for that of the [Commissioner], even if [the court] might justifiably have reached a different result upon a de novo review." *Priel v. Astrue*, 453 F. App'x 84, 86 (2d Cir. 2011) (summary order) (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)) (internal quotation marks omitted).

B.    Determining Whether a Claimant is Disabled

A claimant is disabled under the Act when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity" that the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis to determine whether the claimant's condition meets the Act's definition of disability:

> [I]f the Commissioner determines (1) that the claimant is not working,[11] (2) that he has a 'severe impairment,'[12] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[13]

---

[11]    Under the first step, if the claimant is currently engaged in "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), the claimant is not disabled, regardless of the claimant's medical condition, *id.* § 404.1520(b).

[12]    Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities" in order to have a "severe impairment."  20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1520(a)(4)(ii).

[13]    Under the third step, if the claimant has an impairment that meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled.  20 C.F.R. § 404.1520(d); *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

and (4) that the claimant is not capable of continuing in his prior type of work,[14] the Commissioner must find him disabled if (5) there is not another type of work that claimant can do.[15]

*Burgess*, 537 F.3d at 120 (alteration in original) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

In steps one through four of the sequential five-step framework, the claimant bears the "general burden of proving that he or she has a disability within the meaning of the Act." *Burgess*, 537 F.3d at 128. In step five, if the claimaint is unable to perform her past work, the burden shifts to the Commissioner to show that in light of the claimant's RFC, age, education, and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

## II.  Analysis

   A. THE ALJ DID NOT ERR IN FINDING THAT PLAINTIFF WAS NOT PER SE DISABLED UNDER MEDICAL LISTING 1.04(A).

Plaintiff argues that the ALJ erred in finding at step three of the five-step sequential analysis that plaintiff was not *per se* disabled by her spinal injury under Medical Listing 1.04. (Pl. Mem. at 9-11; Pl. Reply at 1-2.) Moreover, plaintiff

---

[14]  Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(f); *see also* 20 C.F.R. § 404.1520(a)(4)(iv).

[15]  Under the fifth step, the claimant may still be considered not disabled if he or she "can make an adjustment to other work" available in the national economy. 20 C.F.R. § 404.1520(g); *see also* 20 C.F.R. § 404.1520(a)(4)(v)

argues that the ALJ did not provide sufficient rationale for this determination. (*Id.*) The court finds that the ALJ's decision that plaintiff was not disabled by her spinal conditions under Medical Listing 1.04 was supported by substantial evidence in the record and was adequately explained by the ALJ's decision.

The contested paragraph in Medical Listing 1.04 provides that degenerative disc disease, resulting in compromise of a nerve root or the spinal cord, is a disability when accompanied by:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, 1.04.

This definition is comprehensive and exclusive. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1991) (emphasis in original); *see also Gonzalez ex rel. Guzman v. Secretary of U.S. Dep't of Health & Human Services*, 360 Fed. Appx. 240, 243 (2d Cir. 2010)(upholding an ALJ determination that SSD applicant was not per se disabled because applicant

failed to show he met "all of the required criteria" for asthma); *Austin v. Colvin*, No. 12–CV–1470 (NGG), 2013 WL 4077884, at *6 (E.D.N.Y. Aug. 12, 2013)(upholding an ALJ determination that plaintiff was not per se disabled because plaintiff had not "demonstrate[d] that his disability met all of the specified medical criteria of a spinal disorder.")(internal quotation marks omitted).

Here, parties agree that plaintiff has degenerative disc disease and suffers most of the pertinent symptoms listed above. But defendant correctly asserts that the Administrative Record contains no evidence that plaintiff has ever suffered "atrophy with associated muscle weakness or muscle weakness" related to her spinal injury. (Def.'s Mem. of Law in Support of Cross-Motion for J. on the Pleadings and in Opp. to Pl.'s Mot. for J. on the Pleadings ("Def. Mem.") at 20-21; Defendant's Reply Memorandum of Law ("Def. Reply") at 1-2.) Plaintiff does not refute this assertion. (*See* Pl. Mem. at 10; Pl. Reply at 1-2.) Indeed, though plaintiff's treatment records indicate some muscle atrophy in the first dorsal interosseous, there is no mention of accompanying muscle weakness. (*See* Tr. 206, 208-11, 239, 240, 269-71, 273, 277, 285). Rather, Dr. Lippe consistently noted that the strength in plaintiff's first dorsal interosseous, the only muscle subject to atrophy, was intact. (*Id.*)

Plaintiff's argument (Pl. Mem. at 10) that her documented atrophy alone should satisfy the motor loss criterion fails based on the language of Medical Listing 1.04, which requires "atrophy **with** associated muscle weakness **or** muscle weakness." 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.04 (emphases added). The argument also fails because it is well-established that an SSD applicant must meet *all* criteria of a Medical Listing to qualify as *per se* disabled. *See Sullivan*, 493 U.S. at 530; *Gonzalez ex rel. Guzman*, 360 Fed. App'x. at 243; *Austin*, No. 12–CV–1470 (NGG), 2013 WL 4077884, at *6. Because plaintiff fails to meet the motor loss criterion of Medical Listing 1.04, the ALJ correctly found that plaintiff was not *per se* disabled under this listing.

In making an adverse determination at step three, the ALJ should "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Salmini v. Commissioner of Social Sec.*, 371 Fed. Appx. 109, 112 (2d Cir. 2010) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Nevertheless, "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" *Id.*

Here, the ALJ provided scant rationale for his

determination that plaintiff did not satisfy the criteria set forth under Medical Listing 1.04. (Tr. 39.) Indeed, the ALJ indicated only that "the requisite criteria for the relevant listings are absent," with specific reference to "[l]isted impairments under section 1.00 (musculoskeletal)." (*Id.*) Yet, as explained above, the treatment records in the Administrative Record contain ample substantial evidence to support this determination. (*See* Tr. 206, 208-11, 239, 240, 269-71, 273, 277, 285.) Moreover, the ALJ indicated elsewhere in his decision that he had examined plaintiff's treatment records, and noted specifically that "hand and finger dexterity were intact and grip strength was full bilaterally." (Tr. 41.) Because the ALJ's determination that plaintiff was not *per se* disabled under the listings is both supported by substantial evidence in the record and by other portions of the ALJ's decision, this part of the ALJ's determination is affirmed.

## B. THE ALJ ERRED IN FAILING TO PROVIDE 'GOOD REASONS' FOR REJECTING DR. LIPPE'S OPINION RELATING TO PLAINTIFF'S DISABILITY.

Social Security regulations require that the ALJ consider "every medical opinion" in the Administrative Record in determining whether a plaintiff is disabled. 20 C.F.R. §§404.1527(c), 416.927(c). A treating physician's medical opinion "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); *see also Burgess*, 537 F.3d at 128.

Yet, to the extent a treating physician's opinion is inconsistent with the medical record, it may be given less weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(citing 20 C.F.R. §404.1527(c)(4)). In these cases, the ALJ may opt to defer to the opinions of non-treating physicians if such opinions are supported by evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (citing 20 C.F.R. §§404.1527(e), 416.927(e)).

Final responsibility for deciding the extent of an applicant's disability is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2); *see Snell*, 177 F.3d at 133; *Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009)(summary order). A treating physician's opinion of a claimant's RFC and disability does not have controlling weight. 20 C.F.R. §§404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Snell,* 177 F.3d at 133 ("A treating physician's statement that a claimant is disabled cannot itself be determinative.").

Nonetheless, the treating physician's opinion is entitled to substantial deference. 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); *see also Burgess*, 537 F.3d at 128. Under the "treating physician rule," should the ALJ decline to give controlling weight to the treating physician's opinion, the ALJ must "comprehensively set forth reasons for the [actual] weight assigned." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33). In such explanation, the ALJ should consider (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treating relationship; (3) the support for the treating source opinion; (4) the consistency of the opinion with the rest of the record; (5) the specialization of the treating physician; (6) any other relevant factors. 20 C.F.R. §§404.1527(c)(2)-(6), 416.927(c)(2)-(6); *see Burgess*, 537 F.3d at 129; *Snell*, 177 F.3d at 133.

An ALJ may not "arbitrarily substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)(citation omitted). The ALJ must instead provide "good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); *see Snell* 177 F.3d at 134; *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998). "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Burgess*, 537 F.3d at 129-30 (quoting *Snell*, 177 F.3d at

133–34).

Here, the ALJ failed to provide adequately detailed "good reasons" for according limited weight to Dr. Lippe's opinion regarding plaintiff's disability. The ALJ notes Dr. Lippe's long and involved treatment relationship with plaintiff and that Dr. Lippe is an orthopedic specialist. (Tr. 40.) He does not dispute Dr. Lippe's diagnoses. (Tr. 40.) Yet the ALJ discounts Dr. Lippe's opinion regarding plaintiff's disability "to the extent that Dr. Lippe opined that the claimant could not perform any vocational activity." (*Id.*) The ALJ explains only that "such an opinion is not consistent with the mild diagnostic test, limited clinical signs and treatment and the record as a whole." (*Id.*) Yet the ALJ does not identify any particular tests, signs, or other elements of the medical record that he finds to be inconsistent with Dr. Lippe's opinion.

Under the treating physician rule, an ALJ may not reject a treating physician's opinion based solely on such conclusory assertions of inconsistency with the medical record. *See Cabassa v. Astrue*, No. 11–CV–1449, 2012 WL 2202951, at *8 (E.D.N.Y. June 13, 2012) (Matsumoto, J.) (remanding where ALJ failed to specify what "treatment notes or any objective findings" were inconsistent with treating physician's opinion); *Lopez-Tiru v. Astrue*, No. 09–CV1638, 2011 WL 1748515 at *11-12 (E.D.N.Y. May 5, 2011) (remanding where ALJ failed to give controlling weight

to treating physician's opinion "after making several conclusory statements"). Rather, an ALJ must provide some reasoned account as to why he finds the physician's opinion is inconsistent. *See Burgess*, 537 F.3d at 129-30. The ALJ provides no such reasons here.

Instead, the ALJ's references to the record are entirely consistent with Dr. Lippe's assessment. The ALJ's decision notes that plaintiff was "not hospitalized and had no operations," had been able to return to work for six months following her 2009 accident, and was able to perform "a wide range of activities of daily living." (Tr. 41). The fact that plaintiff was able to work for six months following her accident is consistent with her own testimony and Dr. Lippe's assessment that plaintiff's condition had progressively deteriorated following the accident. Additionally, the ALJ does not specify which of plaintiff's "wide range of activities" was inconsistent with Dr. Lippe's opinion.

Moreover, in explaining his preference for the consultant Dr. Skeene's opinion, the ALJ writes only that Dr. Skeene's view "is consistent with the examination and the clinical signs, diagnostic test and treatment received by the claimant." (Tr. 41.) The ALJ does not note any specific parts of the medical record with which Dr. Skeene's opinion is consistent. (*Id.*) The Second Circuit has recently cautioned that "ALJs should not rely

heavily on the findings of consultative physicians after a
single examination." *Selian v. Astrue,* 708 F.3d 409, 419 (2d
Cir. 2013). And where only one consultant disagrees with the
treating physician, the latter's opinion should ordinarily
remain controlling. *See Rankov v. Astrue*, No. 11–CV–02534 (CBA),
2013 WL 1334085 at *9 (E.D.N.Y. Mar. 30, 2013). In short, Dr.
Skeene's opinion, absent more, is not a sufficient reason to
reject Dr. Lippe's opinion.

Where a plaintiff's medical sources have differing RFC
opinions, "[a]n ALJ's failure to reconcile such materially
divergent RFC opinions of medical sources is [] a ground for
remand." *Cabassa*, No. 11–CV–1449, 2012 WL 2202951, at *7. This
is especially true where the ALJ discounts the opinion of the
treating physician. *See Kennedy v. Astrue*, 343 F. App'x 719, 721
(2d Cir. 2009)(summary order)("Where an ALJ fails properly to
acknowledge [the treating physician rule] or to provide 'good
reasons' for the weight given to the treating physician's
opinion, we do not hesitate to remand." (citation omitted)).

Because the ALJ has not acknowledged the treating physician
rule or discussed with any specificity the factors he must
consider in evaluating the treating physician's opinion, remand
is appropriate. While the medical record may provide good
reasons for favoring Dr. Skeene's opinion, under the treating
physician rule the ALJ must explain these reasons. On remand,

the ALJ must state his findings and provide good reasons for the weight he accords to Dr. Lippe's opinion with reference to specific elements of the medical record. The ALJ shall consider and discuss his application of the factors set out in 20 C.F.R. §§404.1527(c)(2)-(6). Finally, the ALJ shall reconcile Dr. Lippe's opinion with that of Dr. Skeene and any other relevant opinions in the record, explaining what evidence he relied on in making his determination.

**C. THE APPEALS COUNCIL ERRED IN REFUSING TO CONSIDER PLAINTIFF'S SUBMISSION OF THE QUESTIONNAIRE FROM DR. LIPPE, BUT NOT IN REFUSING TO CONSIDER THE QUESTIONNAIRE AND CLINICAL NOTES FROM DR. BENATAR.**

The Appeals Council must consider new and material evidence submitted to it by a claimant "only where [the new evidence] relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §404.970(b). Evidence is "new" if it was not considered by the ALJ and is "not merely cumulative of what is already in the record." *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991). Evidence is "material" if it "is both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Id.* "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently." *Id.* Evidence need not have been

generated prior to the ALJ's decision to be material, so long as the evidence relates to the period prior to the ALJ's decision and reveals genuinely new information about the claimant's condition. *Newbury v. Astrue*, 321 Fed. App'x 16, 19 (2d Cir. 2009)(citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)("For example, subsequent evidence of the severity of a claimant's condition may demonstrate that during the relevant time period, the claimant's condition was far more serious than previously thought.") (internal quotation marks omitted)).

Once it has received new and material evidence, the Appeals Council must "evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings or conclusion is contrary to the weight of the evidence currently of record." *Perez v. Chater,* 77 F.3d 41, 44 (2d Cir. 1996)(quoting 20 C.F.R. § 404.970(b)).

Here, plaintiff argues that the Appeals Council erred in refusing to consider three documents submitted by plaintiff, which, although dated after the ALJ's decision, related back to the period prior to that decision. (Pl. Mem. at 11-12, 13-14; Pl. Reply at 2-3). The Appeals Council determined that all three documents related to a period after the ALJ's decision and so "[do] not affect the decision about whether [plaintiff was] disabled beginning on or before" the ALJ's decision. (Tr. 2.)

The court notes that, contrary to defendant's assertion (Def. Mem. at 29), plaintiff submitted the documents in question to the Appeals Council during her administrative appeal. (*See* Tr. 2). Accordingly, the documents are a part of the administrative record for judicial review. *See Perez*, 77 F.3d at 45 ("new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.").

The first of the documents is a "note file listing" from Dr. Benatar relating to an examination in his office on March 2, 2012. (Pl. Mem., Exh. A.) The document largely summarizes plaintiff's medical history and offers an assessment similar to Dr. Lippe's. (*Id.*) Plaintiff also submitted a cervical spine impairment questionnaire completed by Dr. Benatar on March 2, 2012, where he indicates that he had not treated plaintiff prior to March 2, 2012. (Pl. Mem., Exh. B.) Because neither document from Dr. Benatar relates to a direct treatment history prior to the ALJ's decision, but is based instead on a post-decision examination, the Council properly rejected both of the documents as immaterial. *See Jones*, 949 F.2d at 60. To the extent Dr. Benatar's notes in the first document recite plaintiff's medical history during the period prior to the ALJ's decision, the document still fails to introduce any evidence that is not

cumulative to what is already in the record. *Id.*

The last of the three documents is a cervical spine impairment questionnaire from Dr. Lippe, dated January 12, 2012. (Pl. Mem. Exh. B.) In it, Dr. Lippe indicates that his first treatment of plaintiff was on August 25, 2010 and that he had treated plaintiff monthly since that date. (*Id.*) Dr. Lippe also indicates that the symptoms and limitations indicated in the questionnaire began around August 25, 2010. (*Id.*) Thus the questionnaire does clearly relate to a period prior to the ALJ's decision. Moreover, though the document is partly cumulative of information already in the record, it provides a more detailed assessment than is available in the record of plaintiff's physical limitations and ability to work. (*Id.*) The document contains Dr. Lippe's estimates of the number of hours plaintiff could sit, stand, and walk per day, how much weight plaintiff could lift and how frequently, and the recommended length and frequency of breaks, among other details. (*Id.*) None of this information was available in as much detail elsewhere in the record. This evidence is thus new. Particularly in light of the disagreements between Dr. Skeene, the Commissioner's consulting physician, and Dr. Lippe, plaintiff's treating physician, this new evidence is relevant to the ALJ's RFC determination and may have influenced his determination. *See Parajon v. Astrue*, No. 08 Civ. 4815 (AKH), 2009 WL 1834325 (S.D.N.Y. June 24, 2009)("It

cannot be said that the reports would not have changed the ALJ's decision, particularly in light of the disagreements between the Commissioner's consulting physicians and Plaintiff's treating physicians".) Accordingly, the Appeals Council erred by rejecting this document as immaterial and remand for consideration of this evidence is appropriate.

### D. THE ALJ DID NOT PROPERLY EVALUATE PLAINTIFF'S CREDIBILITY IN LIGHT OF EVIDENCE IN THE RECORD.

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding her symptoms in determining whether she is disabled. *See* 20 C.F.R. § 404.1529(a). In evaluating this testimony, the ALJ must follow a two-step process. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)(citing 20 C.F.R. 404.1529(a)). First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to cause the symptoms alleged. *Id.* Second, the ALJ must determine "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

If, at step two, a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted).

If a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, however, "the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010)(summary order)(citing 20 C.F.R. §404.1529(c)(3)). The ALJ specifically must consider additional factors including daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms. 20 C.F.R. § 404.1529(c)(3).

A "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d a 260-61; *see also Escalante v. Astrue*, No. 11 Civ. 375, 2012 WL 13936, at *8 (S.D.N.Y. Jan. 4, 2012)("Conclusory findings of a lack of credibility will not suffice; rather, an ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" (quoting Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996))).

Here, the ALJ found that "the claimant's medically
determinable impairment could reasonably be expected to cause
the alleged symptoms," but that the plaintiff's testimony
concerning the "intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are
inconsistent with the above residual functional capacity
assessment." (Tr. 41.)

The plaintiff first objects that the ALJ assessed her
credibility in light of the ALJ's own RFC assessment rather than
the evidence in the record. (Pl. Mem. at 17-18.) Plaintiff
claims that rather than determining plaintiff's RFC in light of
plaintiff's testimony and the rest of the record, the ALJ
determined plaintiff's RFC *before* hearing plaintiff's testimony,
thus contravening 20 C.F.R. § 404.1529(a). (*Id.*)

The court finds that the ALJ did not determine plaintiff's
RFC prior to hearing plaintiff's testimony. The ALJ explains
that he found plaintiff's statements regarding the intensity,
persistence, and limiting effects of her symptoms incredible
"[a]fter careful consideration of the evidence." (Tr. 41.) He
refers specifically to the opinions of plaintiff's doctors,
plaintiff's diagnostic test results, treatment history, work
history after October 29, 2009, and range of activities at the
time of the hearing. (Tr. 41.) Given that the ALJ pointed to
specific evidence in the record to support his credibility

determination, the ALJ's remark that he found plaintiff's statements incredible "to the extent they are inconsistent with the above residual functional capacity assessment" does not indicate that the RFC assessment was a basis for finding a lack of credibility. *See Briscoe v. Astrue*, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012)(finding that even though ALJ found plaintiff's statements incredible "to the extent they [were] inconsistent" with the RFC, this did not indicate the ALJ's credibility finding was based on the RFC when the ALJ refers specifically to elements of the record); *see also Marquez v. Colvin*, No. 12 Civ. 6819 (PKC), 2013 WL 5568718 at *15 (S.D.N.Y. Oct. 9, 2013) (finding that the ALJ's remark that plaintiff's statements were incredible "to the extent they are inconsistent" with the RFC was an indication of the extent of credibility the ALJ accorded the statements, not the reasons for according the statements such credibility); *Crofoot v. Comm. of Soc. Sec'y,* No. 1:12–CV–521 (GLS/ESH), 2013 WL 5493550, at *11 (N.D.N.Y. Sept. 30, 2013) (holding that "while this sort of boilerplate is inadequate, by itself, to support a credibility finding, . . . its use, does not make a credibility determination invalid.") (internal quotation marks omitted).

While the ALJ's use of boilerplate language does not invalidate the credibility assessment, his inaccurate references to the record and failure to give clear and specific reasons for

the finding do. An ALJ's finding that an applicant is not credible, "must be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d a 260-61. The finding must refer to medical facts in the record and "be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Escalante*, 2012 WL 13936, at *8.

Here, the ALJ explains his credibility finding by noting that "no treating or examining physician offered a definitive opinion that the claimant could not perform any vocational activity." (Tr. 41.) This plainly contradicts the record, which in fact shows that Dr. Lippe opined consistently that plaintiff was unable to work and disabled (*see* Tr. 322, 325, 328, 331, 335, 338, 341, 344, 347, 350, 353, 356, 361), and that plaintiff's "percentage (0-100%) of temporary impairment" was 100%. (*See* Tr. 320-21, 323-24, 326-27, 329-330, 332-33, 336-37, 339-40, 342-43, 348-49, 351-52, 358-59, 362-63.) The continuous finding of plaintiff's treating physician that plaintiff was 100% impaired and unable to work between at least June 15 2010 to August 4, 2011 support plaintiff's testimony regarding the duration, persistence and limiting effects of her disability. Moreover, in the January 12, 2012 cervical spine impairment questionnaire submitted to the Appeals Council that referred to

the period before the ALJ's determination, Dr. Lippe opined that plaintiff's impairments would "last at least twelve months." (Pl. Mem. Ex. B.)

The other reasons that the ALJ provides for his credibility determination are insufficiently specific to permit intelligible plenary review. For example, ALJ conclusorily states that "the diagnostic test revealed mild findings," but does not refer to any specific test or findings or explain their inconsistency with plaintiff's statements. (Tr. 41.) The ALJ observes that plaintiff had returned to work for six months following her accident--subsequent to which, according to Dr. Lippe, her condition worsened--and was currently capable of a "range of daily activities." (*Id.*) Yet the ALJ does not discuss how either of these facts is inconsistent with plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms. (*Id.*)

Where, as here, the ALJ's finding bears no clear relation to the evidence in the record without further findings or clearer explanation for the decision, remand is appropriate. *Pratts*, 94 F.3d at 39. On remand, the ALJ shall assess plaintiff's credibility in light of all evidence in the record and provide clear, specific reasons for the credibility assigned to plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms.

**E. THE ALJ PROPERLY CONSIDERED PLAINTIFF'S OBESITY.**

When determining whether a claimant is disabled, an ALJ must "consider the combined effect of all of [claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to constitute a disability. 20 C.F.R. §§ 404.1523, 416.923. This consideration should include (i) impairments the plaintiff claims to have, and (ii) impairments of which the ALJ receives evidence. 20 C.F.R. §§ 404.1512(a).

"Obesity is not in and of itself a disability." *Guadalupe v. Barnhart,* No. 04-CV-7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing SSR 02-1p, 67 Fed. Reg. at 57,859). However, SSR 02-1p provides that a listing is met "if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-1p, 67 Fed. Reg. at 57,862. Nonetheless, "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases." *Cruz v. Barnhart,* No. 04-CV-9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006). Rather, "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." *Guadalupe,* 2005 WL 2033380, at *6 (citations omitted). "When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is

understood to have been factored into their decisions." *Id.;
see also Paulino v. Astrue*, No. 08-cv-02813, 2010 WL 3001752, at
*18-19 (S.D.N.Y. July 30, 2010) (holding that obesity need not
be explicitly addressed by ALJ where a plaintiff's physical
limitations are noted in the record); *Martin v. Astrue*, No. 05-
CV-72, 2008 WL 4186339, at *3-4 (N.D.N.Y. Sept. 9, 2008) (same),
*aff'd*, 337 F. App'x 87 (2d Cir. 2009).

In this case, plaintiff's physical abilities were assessed
by her treating and consulting physicians in light of her
obesity, which was known to them. (Tr. 168, 244.) Plaintiff's
obesity thus factored into the ALJ's evaluation of the
physician's opinions regarding her disability. The ALJ's failure
to specifically discuss plaintiff's obesity is not a ground for
remand.

## Conclusion

For the foregoing reasons, the court denies both
parties' cross-motions for judgment on the pleadings, and
remands this case for further proceedings consistent with this
opinion.  Specifically, the ALJ should:

1)   Reevaluate the weight that should be assigned to the
     medical opinions from plaintiff's treating physician,
     Dr. Lippe, in light of any existing evidence and any
     new evidence obtained. If the ALJ declines to afford
     Dr. Lippe's opinion controlling weight, the ALJ shall
     provide a clear and explicit statement of the "good
     reasons" for weight given to the opinion of Dr. Lippe
     in accordance with the factors listed in 20 C.F.R. §§
     404.1527(c)(2)-(6), 416.927(c)(2)-(6), and he shall

also reconcile Dr. Lippe's assessment with the opinion of Dr. Skeene in order to adequately explain the ALJ's RFC determination;

2)   Give specific reasons for the credibility assigned to plaintiff's statements concerning the intensity, persistence, and limiting effects of her pain and other symptoms, taking into account the relevant factors enumerated in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), and set forth his determination with sufficient specificity so that the court can determine whether the credibility determination is supported by substantial evidence; and

3)   Reevaluate plaintiff's residual functional capacity in light of any newly obtained information relevant to plaintiff's claims.

**SO ORDERED.**

**Dated:**   Brooklyn, New York
        December 24, 2014

                    _____/s/_____
                    **KIYO A. MATSUMOTO**
                    United States District Judge
                    Eastern District of New York